IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR NO.  13-00553-03 JMS (03) |
| | ) | |
| Plaintiff, | ) | ORDER DENYING DEFENDANT'S |
| | ) | MOTION FOR A NEW TRIAL |
| vs. | ) | |
| | ) | |
| JAMES TAGUPA,   (03) | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**ORDER DENYING DEFENDANT'S MOTION FOR A NEW TRIAL**

**I.  INTRODUCTION**

On December 10, 2014, a jury trial commenced against Defendant

James Tagupa ("Defendant") on two counts of the First Superceding Indictment

("FSI") including: (1) conspiring to possess with intent to distribute and to

distribute 50 grams or more of methamphetamine in violation of 21 U.S.C. §§ 846,

841(a)(1) and 841(b)(1)(A) (Count 1); and (2) possession with intent to distribute

50 grams or more of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and

(b)(1)(A) (Count 2).  On December 18, 2014, the jury returned verdicts of guilty

on both counts, Doc. No. 201, and Defendant is currently awaiting sentencing.

Defendant now moves for a new trial, claiming that the government

failed to disclose material evidence to the defense in violation of *Brady v.*

*Maryland*, 373 U.S. 83 (1963).  Based on the following, the court finds that the evidence was not "suppressed" and therefore DENIES Defendant's Motion for a New Trial ("Motion").

## II.  BACKGROUND

### A.    The Trial

Trial commenced on December 10, 2014, and after four days of testimony, the jury returned a verdict against Defendant on both Counts of the FSI. The evidence presented is summarized as follows:

#### 1.    *The Crux of the Case*

During trial, the government presented testimony and evidence to support its contention that Defendant was involved in a conspiracy to distribute methamphetamine that spanned the islands of Molokai and Maui, with particular emphasis on the events of August 21, 2012.  In support of its case, the government presented multiple tape recordings from a court-authorized wiretap on the cell phone of co-defendant Jon Hans Kaapuni, Jr. ("Kaapuni").[1]  The government's case was premised on the theory that James Fuller ("Fuller") headed a Molokai-based conspiracy involving Kaapuni and others.

And during trial, there was no question that Defendant possessed

---

[1] During trial, Kaapuni was often referred to by his nickname "Hansy-Boy."

2

methamphetamine on August 21, 2012, and that he drove to a dock on Maui to

meet Molokai friends, Celestino Lopez ("Celestino") and Keoni Duffy ("Duffy"),

to transport the methamphetamine to Molokai by boat.  As the Assistant United

States Attorney (AUSA) stated during his closing argument, "the million-dollar

question in this case is what was Mr. Tagupa's knowledge or what knowledge did

he have of the . . . goals of the conspiracy."  Tr. 5-96.  That is, Defendant does not

dispute that he possessed methamphetamine and delivered it to a Maui dock for

transport to Molokai -- instead, he maintained throughout the trial that he did not

*knowingly* possess the methamphetamine.  In essence, he claimed that he acted as

a blind and unknowing courier on behalf of his Molokai childhood friends.  It is

within this context that the court outlines relevant trial evidence.

## 2.    *The Government's Evidence*

The Government's case centered largely on its surveillance of

Defendant on August 21, 2012 and various court-authorized wiretap phone calls,

primarily involving Defendant, Kaapuni, and Fuller.  Prior to August 21, law

enforcement agents learned from a cooperating source, Lopez, that Lopez and

Duffy were scheduled to travel from Molokai to Maui by boat on August 21 to

transport family members back to Molokai.  Lopez told law enforcement that he

"suspected" that Kaapuni was also arranging for Defendant to deliver drugs for

3

Lopez to transport to Molokai as well.  As a result of this information, Defendant was placed under surveillance on August 21.

Defendant was first observed driving to the Maui Home Depot store, where he purchased paint and a chain saw.  He then drove towards Lahaina, although surveillance lost sight of Defendant near the Old Lahaina Sugar Mill (also known as the "Pioneer Mill") for approximately six minutes.  Later, Defendant was again observed outside a Panda Express restaurant, where he was seen "fumbling with stuff" in the bed of his truck.  Finally, he was observed driving to Kahana Bay, where he was met by Celestino, Duffy, Sybil Lopez (Celestino's sister), and Saturnino Lopez (Celestino's father) in a blue Toyota truck driven by Sybil.[2]  The chain saw and paint were then transferred from Defendant's truck bed to the blue truck.  Some time after Defendant left the area, Maui Police Department officers made a traffic stop on Sybil Lopez' blue truck. Approximately 443 grams of methamphetamine was seized from inside an iced tea container, that was wrapped inside two plastic bags and placed inside the chain saw box.

---

[2] Celestino and Duffy had arrived at Kahana Bay in a Boston Whaler that had left Molokai approximately one hour earlier.

### 3.    *Defendant's Evidence*

Defendant testified that prior to August 21, Kaapuni asked

Defendant to purchase paint, and then provide the paint to Celestino Lopez and

Duffy to transport from Maui to Molokai.  He further testified that on August 21,

Kaapuni requested that he also purchase a chain saw.  During this same telephone

call (a landline call, not recorded on the wiretap), Kaapuni "asked me if I could

meet his friend Des in Lahaina at the . . . old sugar mill in Lahania.  And if I could

pick that item up for him and that it was for his house, and then send it back with

[Celesitino] and Duffy."  Tr. 5:32.  Defendant explained that Kaapuni did not tell

him what the "item" was, only stating that it was for Kaapuni's house.  *Id*.

Defendant then explained that on August 21, he first purchased paint

and the chain saw at Home Depot.  Next, he drove to the Old Lahaina Sugar Mill

where Des gave him a brown Safeway paper bag containing an iced tea carton that

had been taped shut.  Tr. 5:36-38.  Defendant testified that per Kaapuni's

instructions, he wrapped the iced tea carton in a plastic bag, placed the plastic bag

in the chain saw box, and then taped the chain saw box.  Tr. 5:38-39.  Defendant

further testified that at no time did he know that the iced tea carton contained

drugs.  Tr. 5:39.  Defendant then drove to Kahana Bay, loaded the chain saw box

into Sybil Lopez' truck, and left the area.  Tr. 5:41.

At 2:58 pm, Duffy called Kaapuni and told him that the truck and chain saw box had been seized by the police.  At 3:11pm, Kaapuni called Defendant and stated, "Brah, you not goin even fucken believe.  Call da house.  Call da house."  Doc. No. 247, Gov't's Opposition to Defendant's Motion, Ex. F (Wiretap Session 1884) at 2.  Defendant then called Kaapuni on a landline (not recorded on the wiretap) and Kaapuni informed Defendant for the first time that the iced tea carton contained drugs.  Tr. 5-45.

## B.    The Post-Trial *Giglio* Disclosures

On May 18, 2015, Defendant filed a Motion for New Trial, claiming that the government had failed to disclose to Defendant that Fuller had provided an exculpatory statement regarding Defendant's involvement in the conspiracy and events of August 21.  Doc. No. 244.  In part, Defendant attached an email exchange between Defendant's counsel and Fuller in which Fuller stated that he told the AUSA and FBI Special Agent Joel Rudow ("Rudow") that Defendant "did not know what was in the package and that he was just helping us getting something to [Kaapuni]."  *Id*. at 244-3.  The Government filed an Opposition, Doc. No. 247, and the court held an evidentiary hearing on July 29, 2015.  Doc.

No. 253.  Both Fuller and Rudow testified at the evidentiary hearing.  *Id.*[3]

After hearing and considering the testimony of Fuller and Rudow, the court concludes that during a March 4, 2014 debrief, Fuller informed Rudow that Fuller had spoken to Defendant on the telephone and told Defendant to go to the Old Lahaina Sugar Mill after lunch on August 21 and meet Fuller's acquaintance to obtain a package.  When Rudow asked Fuller if Defendant was told the contents of the package (that is, that the package contained drugs), Fuller responded that it was Kaapuni's "deal."  Rudow testified that he understood Fuller to mean that Fuller never informed Tagupa that the package would contain drugs.[4]  Thus, the Government knew, before Defendant's trial, that Fuller claimed that he had instructed Defendant to meet someone at the Old Lahaina Sugar Mill to obtain a package, but that Fuller did not tell Defendant that the package contained drugs.  Fuller's March 4, 2014 statement was neither memorialized in an FBI 302 nor otherwise provided to Defendant.  Fuller was not called as a witness by either

---

[3] Following the evidentiary hearing, Defendant submitted a memorandum in support of his Motion for a New Trial on September 18, 2015.  Doc. No. 259.  The Government filed its Opposition on October 9, 2015.  Doc. No. 260.  On October 27, 2015, the court held a hearing on Defendant's Motion.  Doc. No. 263.

[4] Although Fuller's email to Defendant's counsel suggested that Fuller had told Rudow that Defendant in fact was unaware of what was contained in the package, Fuller's testimony does not support such a finding.  Further, although Fuller recalled telling Rudow that Defendant was "innocent," the court credits Rudow's credible testimony that Fuller never made such a statement to him.

party at trial.

### III.  <u>STANDARD OF REVIEW</u>

Where, as here, a defendant's motion for a new trial is brought under

*Brady*, 373 U.S. at 87, the court must determine whether the government violated

the defendant's constitutional right to due process by suppressing material

evidence favorable to the accused.  "A *Brady* violation has three components: (1)

the evidence at issue must be favorable to the accused, (2) the evidence must have

been suppressed by the [government], and (3) the suppression must have been

prejudicial."  *Comstock v. Humphries*, 786 F.3d 701, 708 (9th Cir. 2015) (citing

*Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)).

The court's evaluation of these three components "is inevitably a

contextual inquiry, involving questions of both law *and* fact.  Moreover, it is

intimately intertwined with the trial proceedings: because the court must judge the

effect of the evidence on the jury's verdict, the *Brady* decision can never be

divorced from the narrative of the trial."  *United States v. Jernigan*, 492 F.3d

1050, 1063 (9th Cir. 2007) (quotation and citation omitted).  Finally, "the court

must consider not simply the withheld evidence in isolation, but also the quantity

and quality of other evidence in the record."  *Id.*

The defendant bears the burden of establishing a *Brady* violation.

*See, e.g.*, *United States v. Price*, 566 F.3d 900, 910 (9th Cir. 2009) ("The proponent of a *Brady* claim -- *i.e.,* the defendant -- bears the initial burden of producing some evidence to support an inference that the government possessed or knew about material favorable to the defense and failed to disclose it.").

## IV.  <u>DISCUSSION</u>

The court finds that Defendant failed to establish the second component of a *Brady* violation.  That is, the Government did not suppress Fuller's statements to the Government because Fuller's statements were about a conversation that Fuller had with Defendant (and Defendant was therefore privy to and fully aware of the substance of Fuller's statement).  And given that "suppression by the Government is a necessary element of a *Brady* claim," *United States v. Dupuy*, 760 F.2d 1492, 1501, n.5 (9th Cir. 1985), Defendant's failure to establish that the Government suppressed evidence is fatal to his *Brady* claim. *See, e.g.*, *Vega v. Clark*, 2010 WL 1024589, at *9 (C.D. Cal. Jan. 22, 2010) ("Petitioner's failure to establish the existence of all three elements of a *Brady* violation deprives him of relief.") (citing *Strickler*, 527 U.S. at 281-82, 296). Accordingly, because evaluating the other components of the *Brady* inquiry are unnecessary to the disposition of Defendant's Motion, the court's analysis proceeds in two parts.  First, the court discusses the legal framework underpinning

the "suppression" prong of the *Brady* inquiry.  Next, the court applies the legal

"suppression" analysis to the facts of this case.

## A.    Legal Framework

"[A]ny allegation of suppression boils down to an assessment of what

the State knows at trial in comparison to the knowledge held by the defense."

*Giles v. Maryland*, 386 U.S. 66, 96 (1967).  *See also United States v. Bagley*, 473

U.S. 667, 678 (1985) (explaining that *Brady* applies upon the post-trial discovery

of "information favorable to the accused which had been known to the prosecution

but unknown to the defense"); *United States v. Agurs*, 427 U.S. 97, 103 (1976)

(same).

Evidence is "suppressed" -- and thus subject to *Brady*    if the

evidence "is known to the State and not disclosed to the defendant."  *Comstock*,

786 F.3d at 709.  By contrast, if a *Brady* claim is based on "information already

known to the defense (or that could have been determined through reasonable

diligence)," *United States v. Motta*, 2012 WL 4633899, at *2 (D. Haw. Oct. 1,

2012), the evidence is not suppressed.  *See, e.g., Cunningham v. Wong*, 704 F.3d

1143, 1154 (9th Cir. 2013) (finding that, because defendant's attorneys possessed

the "salient facts" to access the alleged *Brady* evidence, "[t]here was no

suppression of this easily attainable evidence"); *Bonnaudet v. Henry*, 303 F.

App'x 375, 376 (9th Cir. 2008) (finding that, because defendant "took the van to the body shop herself and knew its condition," she was "aware of the essential facts enabling her to take advantage of the exculpatory evidence") (internal quotations and alterations omitted); *United States v. Aichele*, 941 F.2d 761, 764 (9th Cir. 1991) ("When, as here, a defendant has enough information to be able to ascertain the supposed *Brady* material on his own, there is no suppression by the government.").

This general principle also applies where the alleged *Brady* evidence is a witness statement.  That is, so long as the defense is "on notice of the essential facts which would enable [it] to call the witness and thus take advantage of any exculpatory testimony that [the witness] might furnish," *Brady* does not require the government "to make a [witness'] statement known" to the defense.  *United States v. Bond*, 552 F.3d 1092, 1096 (9th Cir. 2009) (quotations and citations omitted).  *See also Dupuy*, 760 F.2d at 1502 (same).  Accordingly, the government's *Brady* obligations are satisfied so long as the defense is "on notice of the essential facts" of a witness statement.  *Id.*

It is therefore clear that the government does not commit a *Brady* violation if the defense has meaningful access to the essential facts of the exculpatory evidence.  But what, exactly, does it mean for "the defense" to have

11

meaningful access to the essential facts of the exculpatory evidence?  That is, where only the defendant is aware of the alleged *Brady* evidence, is the defendant's knowledge imputed to "the defense" such that the government is relieved of its *Brady* obligations?  Or must the government disclose exculpatory evidence to defense *counsel* even if the defendant is unquestionably "on notice of the essential facts," *id.*, underlying the *Brady* claim?[5]

At first glance, the Ninth Circuit's answers to these questions appear to diverge.  In *United States v. Howell*, 231 F.3d 615 (9th Cir. 2000), the court broadly stated that "[t]he availability of particular statements through the defendant himself does not negate the government's duty to disclose." *Id.* at 625.  But in *Raley v. Ylst*, 470 F.3d 792 (9th Cir. 2006), the court stated that "where the defendant is aware of the essential facts enabling him to take advantage of any exculpatory evidence, the Government does not commit a *Brady* violation by not bringing the evidence to the attention of the defense." *Id.* at 804.  Because a *Brady* analysis "is inevitably a contextual inquiry," *Jernigan*, 492 F.3d at 1063, the court next examines the context of *Howell* and *Raley*.

---

[5]  Courts, in discussing *Brady* obligations, often use the terms "defendant," "defense counsel," and "the defense" interchangeably.  Although there are many instances where these terms are functionally synonymous, there are other cases -- such as this one -- where the distinction matters.

*1.*    **Howell**

In *Howell*, Sean Howell ("Howell") and his female companion,

Quinticca Mosely ("Mosely"), were arrested after acting suspiciously at a bus

depot and a drug-sniffing dog "alerted" to a nearby bag containing cocaine.  231

F.3d at 618-19.  The police searched both Howell and Mosely incident to arrest;

the police recovered $30 from Mosely and "$487 in Howell's clothes and $1,500

hidden under the sole of Howell's left shoe."  *Id.* at 619.

Approximately two weeks before Howell's trial, the police discovered

a "glaring" mistake in two separate police reports:

> both reports erroneously indicated that $487 was taken
> from Mosely's person and $1,500 from her left shoe,
> when, in fact, the sums were recovered from Howell's
> person and his left shoe.  Both reports had been given to
> the defense during routine discovery.  The government
> learned of the material errors in the reports before trial.
> However, the prosecutor did not promptly disclose the
> mistakes to the defense.

*Id.* at 623.  Unsurprisingly, defense counsel "relied on the misidentification in the

reports to construct its theory that it was Mosely, not Howell, who was

transporting drugs . . . . The prosecutor took no steps to correct this error.  She

remained silent even though she was well aware of the defense attorney's reliance

on the mistakes in the officers' reports."  *Id.* at 623-24.  Thus, in his opening

statement, Howell's attorney emphasized that the nearly $2,000 was found on Mosely, not Howell, and the prosecutor did nothing to correct the error. *Id.* at 623.

Howell appealed, claiming that "the prosecutor's failure to reveal **the error** in the reports prior to trial" violated *Brady*. *Id.* at 624 (emphasis added). That is, the *Brady* violation that Howell complained of was the government's failure to correct the mistake in the police reports which Howell's counsel then relied upon to Howell's detriment. In response, the government admitted that it "learned of the mistake in the police reports before trial and did not reveal the error to the defense," but argued that Howell was not entitled to a mistrial because, among other reasons, "Howell knew that the money was actually recovered from him" so "the government was under no obligation to disclose the information." *Id.* at 624. The court rejected the government's position:

> The government's contention that it had no duty to disclose the mistake to the defense because Howell knew the truth and could have informed his counsel is wrong. The availability of particular statements through the defendant himself does not negate the government's duty to disclose. Defendants often mistrust their counsel, and even defendants who cooperate with counsel cannot always remember all of the relevant facts or realize the legal importance of certain occurrences. Consequently, defense counsel is entitled to plan his trial strategy on the basis of full disclosure by the government regardless of the defendant's knowledge or memory of the disclosed statements.

14

*Id.* (internal citations and quotations omitted).

Although portions of the above excerpt contain sweeping language, such language was in direct response to the government's argument that "it had no duty to disclose **the mistake** to the defense because Howell knew the truth and could have informed his counsel." *Id.* (emphasis added). Accordingly, although *Howell* contains a broad pronouncement -- *i.e.*, that "[t]he availability of particular statements through the defendant himself does not negate the government's duty to disclose," *id.* -- implicit in the broad language is the specific context where the government fails to disclose a known **mistake**.

Indeed, in *Howell*, it was the mistake itself that constituted an independent *Brady* violation. This is because "[o]ne of the bedrock principles of our democracy, implicit in any concept of ordered liberty, is that the State may not use false evidence to obtain a criminal conviction." *Hayes v. Brown*, 399 F.3d 972, 978 (citing *Napue v. Illinois*, 360 U.S. 264, 269 (1959) (quotations omitted)). And, when the government knowingly allows false evidence to become a part of the trial narrative, this "is inconsistent with the rudimentary demands of justice. Thus, a conviction obtained through the use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." *Id.* (quotations and citations omitted). Put simply, where, as in *Howell*, the

15

government knowingly allows false evidence to become a part of the trial narrative, the government violates the defendant's constitutional right to due process, *id.*, and it is the act of making this mistake that is the *Brady* violation. As such, *Howell* is distinguishable from cases "where there was no government action to throw the defendant off the path of the alleged *Brady* information." *Bond*, 552 F.3d at 1096. Accordingly, *Howell* is best read to apply only to the narrow context where there was government action to "throw the defendant off the path of the alleged *Brady* information," *id.*, such as by failing to correct a known mistake regarding evidence the government provided to the defense.

## 2. Raley

In *Raley*, the defendant made a *Brady* claim on the ground that the prosecution "fail[ed] to disclose exculpatory and mitigating evidence contained in [his] medical records from his pretrial confinement at the Santa Clara County Jail." 470 F.3d at 803. The court rejected the defendant's *Brady* claim because:

> [the defendant] possessed the salient facts regarding the existence of the records that he claims were withheld. [The defendant] knew that he had made frequent visits to medical personnel at the jail. He knew that he was taking medication that they prescribed for him. Those facts were sufficient to alert defense counsel to the probability that the jail had created medical records relating to [the defendant.] Because [the defendant] knew of the existence of the evidence, his counsel could have

16

sought the documents through discovery.

*Id.* at 804 (citing *United States v. Griggs*, 713 F.2d 672, 674 (11th Cir. 1983) (per curiam)).  Thus, the facts of *Raley* make clear that only the defendant -- and not defense counsel -- was aware of the exculpatory medical records, and yet the court found no suppression under *Brady*.  *Id.*  Rather, the court held that, where the defendant "knew of the existence of the evidence," the defense counsel should be deemed "alert[ed]" to the evidence, too.  *Id.*  As such, *Raley* makes clear that there is no *Brady* violation if the defendant has sufficient knowledge of the exculpatory evidence even if the government does not inform the defense counsel, because the defendant's knowledge is imputed to "the defense."

### 3.   *Additional Ninth Circuit Support for* Raley

There is additional Ninth Circuit authority in support of the *Raley* rule (as opposed to a broad reading of *Howell*).  *See, e.g., Bonnaudet*, 303 F. App'x at 376 (rejecting defendant's *Brady* claim because, given that the defendant "took the van to the body shop herself and knew its condition," the defendant was "therefore aware of the essential facts enabling her to take advantage of the exculpatory evidence") (citations and quotations omitted); *Cunningham*, 704 F.3d at 1153-54 (explaining that "[u]nder *Brady*'s suppression prong, if the defendant is aware of the essential facts enabling him to take advantage of any exculpatory evidence, the

government's failure to bring the evidence to the direct attention of the defense does not constitute suppression") (quotations omitted)).  Indeed, in *Tennison v. City and County of San Francisco*, 570 F.3d 1078 (9th Cir. 2008) -- the only Ninth Circuit case to substantively discuss both *Howell* and *Raley* -- the court made clear that the *Raley* rule applies where the defendant has personal knowledge of the exculpatory material (as opposed to situations where the information is second or third-hand).

In *Tennison*, the Ninth Circuit determined that the government wrongfully "withheld exculpatory evidence" in a murder case against defendants John Tennison ("Tennison") and Antoine Goff ("Goff").  *Id.* at 1081.  Among other problems, the police in *Tennison* twice interviewed a witness, Chanté Smith, who told the police that Tennison was not "present at the murder," identified a man named Lovinsky Ricard as the actual murderer, and provided the police with a hand-drawn map of the incident.  *Id.* at 1083.  The police's interview notes did not include any of these details, and the government never provided Tennison's attorney with "any information about [Smith's] interview" prior to Tennison's conviction.  *Id.* at 1084.

Ultimately, Tennison was granted federal habeas relief, and he subsequently filed a 42 U.S.C. § 1983 claim against the police.  *Id.*  After the

18

district court denied the police's motion for summary judgment, the police

appealed. *Id.* It is in this context that the court distinguished *Raley*, which the

police had relied upon for "the proposition that *Brady* is not violated where the

defendant is aware of exculpatory evidence," *id.* at 1090-91, and discussed

*Howell.* The court explained:

> *Raley* is distinguishable from [*Tennison*]. The evidence
> allegedly withheld in *Raley* was evidence contained in
> the petitioner's medical records from his pretrial
> confinement. We reasoned that the petitioner "knew that
> he had made frequent visits to medical personnel at the
> jail," and "knew that he was taking the medication that
> they prescribed for him." *Raley*, 470 F.3d at 804. Thus,
> in *Raley*, we concluded that "[t]hose facts were sufficient
> to alert defense counsel to the probability that the jail
> had created medical records relating to Petitioner." *Id.*
>
> A defendant's awareness of his own medical history,
> however, is not analogous to [Tennison and Goff's]
> awareness that Smith might have information helpful to
> their case. Tennison . . . had heard that Smith might
> have information about the shooting, but, even at
> Tennison's hearing on his new trial motion, [Tennison's
> counsel] thought that her last name was White. Thus,
> not only did defense counsel not even know Smith's
> name, but he certainly did not know the extent of the
> information that Smith had given to [the police]. Smith
> contradicted [a testifying witness'] account of where the
> chase started, gave the names of many of the people
> involved, including Ricard, and exonerated Tennison and
> Goff.
>
> In *United States v. Howell*, 231 F.3d 615 (9th Cir. 2000),

the government argued that its failure to notify defense counsel of errors in police reports before trial was not a *Brady* violation because the defendant "knew the truth and could have informed his counsel." *Id.* at 625. We held that "[t]he availability of particular statements through the defendant himself does not negate the government's duty to disclose." *Id.* Defendants "cannot always remember all of the relevant facts or realize the legal importance of certain occurrences. Consequently, "[d]efense counsel is entitled to plan his trial strategy on the basis of full disclosure by the government . . . .'" *Id.* (citation omitted).

Even if Goff had heard that Smith had information about the murder, this knowledge is not the same as Smith's extensive statements to the police. We agree with the reasoning of the Seventh Circuit, which rejected "as untenable a broad rule that any information possessed by a defense witness must be considered available to the defense for *Brady* purposes." *Boss v. Pierce*, 263 F.3d 734, 740 (7th Cir. 2001). The court reasoned that "it is simply not true that a reasonably diligent defense counsel will always be able to extract all the favorable evidence a defense witness possesses. Sometimes, a defense witness may be uncooperative or reluctant." *Id.* This is precisely the situation that [Tennison and Goff] confronted in the instant case. Although both Tennison and Goff informally asked Smith to help them, she was unwilling to become involved because she was afraid, and because she did not want to have to testify at the trial.

*Id.* at 1091.

Ultimately, then, *Tennison* clarifies what it means for exculpatory evidence to be "known" to the defendant. That is, although the *Tennison*

defendants had "heard that Smith had information about the murder," *id*., the

*Tennison* defendants did not have meaningful access to the "essential facts" that

would "enabl[e] [them] to take advantage of [the] exculpatory evidence" that

Smith told the government. *Raley*, 470 F.3d at 804. Indeed, even though the

*Tennison* defendants asked Smith for help, she refused to "become involved

because she was afraid, and because she did not want to have to testify at the

trial." *Tennison*, 570 F.3d at 1091. Thus, in *Tennison*, only the government was

truly privy to the exculpatory information that Smith possessed. Indeed, this

appears to be why *Tennison* cited to *Howell* -- *i.e.*, for the proposition that it is a

*Brady* violation where the defendant is not able to meaningfully access the

exculpatory information (because, for example, the defense in *Howell* did not

know the government was aware that the defense was relying on erroneous police

reports). As such, *Tennison* is distinguishable from situations such as *Raley* where

the defendant has enough information to be able to ascertain the supposed *Brady*

material on his own.

### 4.    *Persuasive Sister Circuit Authority*

Five other circuits have likewise applied the *Raley* rule. That is, the

Third, Fourth, Fifth, Seventh, and Eleventh Circuits have all concluded that *Brady*

does not obligate the government to inform *defense counsel* of the exculpatory

evidence if the *defendant* himself already has knowledge of the exculpatory

evidence.  *See Gov't of Virgin Islands v. Martinez*, 780 F.2d 302, 308 (3d Cir.

1985) (indicating that the defendant was responsible for informing his defense

counsel of exculpatory evidence barring extenuating circumstances such as a

language barrier or a mental defect that made the defendant incapable of doing

so); *McHone v. Polk*, 392 F.3d 691, 702 (4th Cir. 2004) (holding that, where the

alleged *Brady* material consists of a third-party recounting a conversation with the

defendant to investigators, "this evidence cannot form the basis of a *Brady* claim"

because the defendant participated in the conversation); *Pondexter v. Quarterman*,

537 F.3d 511, 526 (5th Cir. 2008) (finding no *Brady* violation where "Pondexter

asserts only that the State suppressed statements he allegedly made to Kendricks

while incarcerated with him . . . . [and] if Pondexter made these statements to

Kendricks, Pondexter, of course, was fully aware both of having done so and of

Kendricks' ability to verify they had been made"); *United States v. Dawson*, 425

F.3d 389, 393 (7th Cir. 2005), *on reh'g in part*, 434 F.3d 956 (7th Cir. 2006)

(finding no *Brady* violation where "the government was aware of what was said in

the [defendants'] conversations but not recorded, because the defendants, being

parties to the conversation, were equally aware"); *Boyd v. Comm'r, Ala. Dep't of

Corr.*, 697 F.3d 1320, 1335 (11th Cir. 2012) (finding that, because "Boyd was

obviously present during this questioning and thus aware of anything he may have said," the "[e]vidence is not suppressed" as it "proves that the petitioner was aware of the existence of that evidence before trial") (alterations and quotations omitted).

And the Second Circuit has gone *further* than the *Raley* rule. *United States v. Barcelo*, 2015 WL 5945997 (2d Cir. Oct. 14, 2015), found no *Brady* violation where the government did not disclose the substance of the testimony of one of the police officers who was present during a traffic stop involving the defendant. The court observed that the defendant knew that the police officer was "present during the traffic stop and might have useful evidence." *Id.* at *2. Accordingly, the court held that the defendant "either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence." *Id.* As such, the court concluded "that evidence was not suppressed." *Id.* (quotation omitted).

The court thus concludes that, absent a limited *Howell* exception (where the government provides false or misleading information to the defense and fails to correct its error), the *Raley* rule applies -- *i.e.*, if a defendant himself (as opposed to defense counsel) is aware of the exculpatory evidence, there is no "suppression" of that evidence.

23

**B.    Application of Legal Framework**

As previously discussed, Defendant claims that the Government

violated its *Brady* obligation by failing to disclose Fuller's conversation with the

Government during his March 4, 2014 debrief.  Specifically, Fuller told a

government agent that he had spoken to Defendant on the telephone and asked

Defendant to retrieve a package from a third party near the Pioneer Mill in

Lahaina, but that he never told Defendant that the package contained drugs.  Fuller

further testified that he was not in position to know what Defendant *actually* knew

about the package; rather, Fuller made clear that he was only testifying as to what

he told Defendant.

Defendant had the **<u>exact</u>** same information that he now claims was

suppressed by the Government.  That is, given that Fuller relayed to the

Government details of a conversation that Fuller had *with* Defendant, Defendant --

as a party to that conversation -- necessarily had knowledge of the essential facts

regarding Fuller's conversation with the Government.

Applying *Raley*, the court therefore concludes that the Government

did not "suppress" any evidence in violation of *Brady.*  The fact that defense

counsel chose not to call Fuller as a trial witness was a strategic decision, not a

*Brady* violation.  "When, as here, a defendant has enough information to be able to

ascertain the supposed *Brady* material on his own, there is no suppression by the government." *Aichele*, 941 F.2d at 764.

The court rejects defense counsel's arguments, made during the October 27, 2015 hearing, that imply the Government was under a *Brady* obligation to corroborate Defendant's theories at trial. The court declines to extend *Brady* that far -- *Brady* does not create a generalized rule of discovery for the defense. *See Brady*, 373 U.S. at 90 (refusing to "raise . . . trial strategy to the dignity of a constitutional right"). *See also Bagley*, 473 U.S. at 675 (observing that the purpose of *Brady* "is not to displace the adversary system as the primary means by which truth is uncovered"); *Agurs*, 427 U.S. at 107 ("[T]here is, of course, no duty to provide defense counsel with unlimited discovery of everything known by the prosecutor.").

In short, the court finds that Defendant has failed to establish a *Brady* claim.

///

///

///

///

///

## V.  <u>CONCLUSION</u>

Based on the foregoing, Defendant's Motion for a New Trial is

DENIED.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, November 4, 2015.



   /s/ J. Michael Seabright
J. Michael Seabright
United States District Judge

*United States v. Tagupa,* Cr. No. 13-00553 JMS (03), Order Denying Motion for a New Trial